DELILAH WELTS, Respondent, *v.* THE CONNECTICUT MUTUAL LIFE INSURANCE COMPANY,* Appellant.

A provision in a policy of life insurance, forfeiting the policy in case the assured shall enter into any military or naval service without the consent of the company, includes only such service as will require the person entering into it to do duty as a combatant. An employment therefore, by military authorities, in constructing a railroad bridge, is not within the prohibitions of the policy, and does not invalidate it.

At the time of issuing the policy in question, defendant for a further premium of fifty dollars, by a written instrument, gave the assured permission to go south of the thirty-sixth degree of north latitude and reside there during the time of one year; provided, and with the understanding and agreement, that the policy did not insure against death from any of the casualties or consequences of war or rebellion, or from belligerent forces. While engaged in building a railroad bridge, under the direction of the military authorities of the United States, about thirty miles in the rear of the Union army, and still further from the Confederate forces, the assured was shot and killed by two of a party of men not in uniform, who robbed the men employed upon the work and residents near.

*Held*, that the language of the proviso included only death from casualties or consequences of war or rebellion carried on or waged by authority of some *de facto* government; that this case did not come within that limit, and that defendant was liable.

(Argued May 15, 1871; decided September term, 1871.)

APPEAL from judgment of the General Term of the Supreme Court in the seventh judicial district, entered on a verdict for the plaintiff, given by direction of the court at circuit. Exceptions heard at the General Term in the first instance. (Reported below, 46 Barb., 412.)

The action is to recover the sum of $5,000 insured by the defendant, by a policy on the life of Philip J. Welts, payable to the plaintiff, his wife, in ninety days after notice and proof of his death, dated September, 1864.

The policy contains a proviso that in case the said Philip shall, without the consent of the company, previously obtained and indorsed upon the policy, visit those parts of the United States which lie south of the thirty-sixth degree

of north latitude, between the first of June and the first of November, or shall, without such previous consent thus indorsed, enter into any military or naval service whatsoever (the militia not in actual service excepted), the said policy shall be void, null and of no effect. At the time of issuing the policy, the defendants, in consideration of the further premium of fifty dollars, by a written instrument gave the said Philp permission to go south of the thirty-sixth degree of north latitude, and reside there or return, during the term of one year, without prejudice to the policy; provided, and the permission was given with the understanding and agreement, that the said Philip was not insured by said policy against death from any of the casualties or consequences of war or rebellion, or from belligerent forces in any place where he may be.

The defendants allege by their answer:

1st. That the said Philip entered the military service of the United States, and lost his life while in such service.

2d. That he lost his life by the casualties or consequences of war or rebellion, or from belligerent forces, within the proviso or exception of the permission given.

The said Philip was killed by pistol shots at Cedar Hill, in the northern part of the State of Tennessee, on the 31st of October, 1864. The preliminary proof of his death was furnished to the company in due form. At the time of his death he was engaged as superintendent in charge of constructing bridges on the Edgfield and Kentucky railroad, in the employment of the government of the United States, having about fifteen laborers and mechanics assisting in the business under his superintendence. The railroad was under the direction of, and used, or to be used, by the military authorities of the United States for military purposes. He was so employed about thirty miles north and in the rear of the Union army commanded by General Thomas, and eighteen miles south of the northern line of the State. The forces of the rebellion were still farther from the party of laborers, and south of the Union army. Welts, and the

laborers and mechanics whom he was superintending, had no arms, wore no uniforms, and there were no soldiers at the place, nor anywhere nearer than the Union lines at Nashville.

On the afternoon of October 31, 1864, four men on horse-back rode up and inquired if there was any one there who wore a federal uniform. They inquired for the foreman. Mr. Welts replied that he was the man, and they ordered him to come to them, and he did not obey. Two of the mounted men fired their pistols at Welts, shooting and wound-ing him four times, so that he died the next day. The four then robbed the other men employed there, and also one or two southern men who resided near, and in about ten minutes rode away, without attempting to injure any other person, or making any prisoners, or disturbing the railroad, or the work under construction. The four wore no arms, except navy revolvers, and no military trappings upon their persons or horses, except that two of them wore federal military over-coats, it being common for persons, although not in the Union military service, to wear such garments. They made no statement as to themselves, and it did not appear that they belonged to the Confederate army, or acted under Confederate authority.

At the close of the evidence, the judge directed a verdict for the plaintiff for the amount claimed and interest, to which the counsel for the defendant excepted. The exceptions were heard, in the first instance, at the General Term, and, being there overruled, judgment was entered on the verdict for the plaintiff.

*George T. Spencer* for appellant. The late civil war and its incidents are matters of public history, of which courts are authorized to take judicial notice. (1 Greenleaf's Evi-dence, 8, 10, 16; *Swinnerton* v. *Columbian Ins. Co.*, 37 N. Y., 174; *Prize Cases*, 2 Black, 667; *The Venice*, 2 Wallace, 259; *Mrs. Alexander's Cotton*, id., 420; *Thorrington* v. *Smith*, 8 id., 7.) The assured was in military service within the condition of the policy. (Vattel's Law of Nations, 375,

§ 179; Act of Congress, January 31, 1862, § 1.)   The peril by which assured lost his life was within the proviso of the permit.   (*Mrs. Alexander's Cotton*, 2 Wallace, 419; *The Peterhoff*, 5 id., 60; *Thorrington* v. *Smith*, 8 id., 11; *Sanderson* v. *Morgan*, 39 N. Y., 231; *Ex parte Milligan*, 4 Wallace, 126, 127; *Hauger* v. *Abbott*, 6 id., 540, 541; *The Venice*, 2 id., 277; *Circassian*, id., 135; Vattel, 399, §§ 220, 223, 225; p. 400, § 228; McPherson, 117, 118, 119, 121.)   The peril was one of the consequences of the war within the intent and meaning of the permit.   (*Savage* v. *Corn Exchange Fire and Inland Ins. Co.*, 4 Bosworth, 19; *Sarles* v. *Mayor of New York*, 47 Barb., 447; *Thompson* v. *Hopper*, 38 Eng. Law and Equity R., 39, 46; *Peters* v. *The Warren Ins. Co.*, 14 Peters, 99, 108, 109; Broom's Legal Maxims, 168; *Tilton* v. *Hamilton Fire Ins. Co.*, 1 Bos., 372, Opinion of HOFFMAN, Justice; *Ins. Co.* v. *Tweed*, 7 Wallace, 44; *St. John* v. *Am. Mut. Fire Ins. Co.*, 11 N. Y., 516; *Tilton* v. *H. Fire Ins. Co.*, 1 Bos., 372, 383; *Butler* v. *Weldman*, 3 B. & A., 398, 407; *Swinerton* v. *C. Ins. Co.*, 37 N. Y., 174; *Mausan* v. *Ins. Co.*, 6 Wal., 1; *Powill* v. *Hyde*, 34 Eng. L. & E., 44.)   The fact of rebels being robbers on land and pirates on the seas does not preclude their being regarded as belligerents. (*Dole* v. *Merchants' Mut. Ins. Co.*, 51 Maine, 465; *Dole* v. *N. E. Mut. Ins. Co.*, 6 Allen's Mass., 373; *Fifuld* v. *Ins. Co. of State of Penn.*, 47 Penn. State Rep., 166.)   See, in this case, opinions of STRONG, AGNEW and READ, JJ.   *Cluff* v. *Mutual Benefit Life Ins. Co.*, 13 Allen, 308; *Klimworth* v. v. *Shephard*, 4 Ellis and Ellis, 447.)

*George B. Bradley* for respondent.   The persons who killed assured were in no sense belligerents. (*Swinerton* v. *Col. Ins. Co.*, 37 N. Y., 174; *Kershaw* v. *Kelsey*, 100 Mass., 561.)   The assured was not south of 36 degrees north latitude at the time he was killed, and the proviso of the permit has no application. (*Harper* v. *N. Y. C. Ins. Co.*, 22 N. Y., 441; *Potter* v. *A. Ins. Co.*, 5 Hill, 147, 149; 10 Wend., 250; *Van Hagen* v. *Van Rensselaer*, 18 J., 423; *Elmendorf* v.

*Lansing*, 5 Cow., 470, 471; *Hoffman* v. *Ætna Ins. Co.*, 32 N. Y., 413; *Merrick* v. *Germania Ins. Co.*, 54 Pa., 277.)

LEONARD, C. The policy enjoined it upon Welts that he was not to go south of the thirty-sixth degree of north latitude in the United States, and not to enter into any military or naval service whatsoever, without the consent of the company, indorsed in writing upon the policy, under the penalty of rendering the contract void. At the same time with the issuing of the policy, the company, for a further consideration, granted their written permission to go south of the line of latitude mentioned, for the term of one year, and added to the consent, as a proviso or condition, that it was given with the understanding and agreement, that Welts was not insured by the policy against death from any of the " casualties or consequences of war or rebellion, or from belligerent forces in any place where he may be."

The permission which abrogates for one year the restriction against going south of the thirty-sixth degree of latitude at certain seasons, imposes a new limitation upon the liability of the company, in case of death from certain casualties or consequences of war, rebellion or belligerent forces, which were more to be apprehended in that portion of the United States, at the time the policy was issued, south of the thirty-sixth degree of latitude, and in the vicinity of that line, than the dangers from climatic causes. For the consideration of fifty dollars, the company took the hazard of the climate, and the assured took the risk of the casualties or consequences mentioned.

There is no evidence that the deceased availed himself of the permission to go south of the latitude mentioned; and, at the time of his death, he was clearly north of it, according to approved maps. If there was sufficient evidence, then, to go to the jury, tending to prove that the deceased entered the military service of the United States, or that his death happened from any of the casualties or consequences mentioned in the proviso attached to the written permission to go south,

the direction to render a verdict for the plaintiff was erroneous, and the defendant's exception well taken.

The deceased held no office of a military character, and there is no evidence that he was ever enlisted or enrolled as a private. I am not much experienced in military affairs; but it is generally understood that there is a record of the entry of both officers and privates into the military service. There is, clearly, no evidence of this character.

There is some evidence that he, as well as the mechanics and laborers under his superintendence, were at work by the month. That does not indicate military obligation. The fact that he and the others were paid by the military paymaster, proves nothing, on the question whether the deceased was in the military service. Such payment might be so made without having entered that service. His employment was not belligerent. On the contrary, the most decided non-resistant might consistently do the same work. It is urged that the railroads were under a military director, and were used for military purposes exclusively. The roads could not be so used until bridges were constructed; and I am unable to perceive that a civilian might not engage in their construction without losing his standing as a non-combatant. Suppose that the military director of railroads employed the deceased, and that he was subject to his authority while so employed; it does not necessarily follow that he had entered the military service. Entering the military service, within the meaning of the policy, must be taken in its strict or limited sense, as most advantageous to the assured, as well as all other provisions therein. The company frame the policy and choose the language. If there is anything uncertain, it is the right of the assured to enjoy the most favorable rule of construction. The general understanding of the term includes such persons only as are liable to do duty in the field as combatants.

There is no evidence that the widow is entitled to a pension, as would be the case if her husband had perished in the military service of the United States during the rebellion

There is, in my opinion, an entire absence of any evidence that the deceased was in any military service, according to the meaning of the policy. Did he lose his life by the casualties or consequences of war, rebellion, or from belligerent forces? Certainly there is no evidence that this party of four, who came without any of the insignia of war, armed with revolvers only, and doing nothing for the service of the public or Confederate cause, but confining their operations to robberies for their personal advantage, and to the murder of an unarmed man, not in the dress of a federal soldier, constituted a belligerent force, or any part of such force. The war or rebellion may be a remote cause of the death, as it was the cause of disorder and lawlessness; but the proximate cause is murder and highway robbery.

It would be a very unnatural and forced construction that would relieve the defendants from liability, by holding that the four robbers and assassins who murdered Philip J. Welts, and robbed the mechanics and laborers whose work he was superintending, were acting under the authority of the Confederate States. Had the defendants intended to attach such a meaning, the provision would have been directly for exemption from liability for death by violence. The language used can be considered as including only death from casualties or consequences of war or rebellion, carried on or waged by authority of some *de facto* government, at least. No evidence was produced tending to bring the defendant's case within any such limit.

There were no facts for the consideration of the jury.

The judgment should be affirmed, with costs.

All concur.

Judgment affirmed.